BURLINGTON NORTHERN RAILROAD
COMPANY, et al., Plaintiffs,

v.

C. Michael LENNEN, et al., Defendants.

The ATCHISON, TOPEKA AND SANTA
FE RAILWAY CO., et al., Plaintiffs,

v.

C. Michael LENNEN, et al., Defendants.

Nos. 82–1561, 82–1562.

United States District Court,
D. Kansas.

Dec. 1, 1982.

Supplemental Opinion Dec. 9, 1982.

Chester A. Arterburn, Jr., Sabatini, Waggener, Vincent & Arterburn, Topeka, Kan., for Union Pacific Railroad.

Clayton M. Davis, Mark L. Bennett, Jr., Davis & Bennett, Topeka, Kan., for Missouri-Kansas-Texas Railroad.

Everett B. Gibson, James W. McBride, Laughlin, Hallie, Clark, Gibson & McBride, Washington, D.C., for Burlington Northern Railroad and Missouri Pacific Railroad.

J.B. Reeves, Laurence E. Garrett, Topeka, Kan., for Atchison, Topeka & Santa Fe.

Mark L. Bennett, Jr., Davis & Bennett, Topeka, Kan., for Chicago, Rock Island & Pacific and St. Louis and Southwestern Railway.

Robert C. Foulston, Jay F. Fowler, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Chicago and North Western, Kansas City Terminal and Missouri-Kansas-Texas Railroad.

Carol B. Bonebrake, Kansas Dept. of Revenue, Topeka, Kan., and James J. McGannon, Regan & McGannon, Wichita, Kan., for defendants.

Robert J. O'Connor, Hershberger, Patterson, Jones & Roth, Wichita, Kan., Donald J. Horttor, Grant M. Glenn, Cosgrove, Webb & Oman, Topeka, Kan., for intervening counties.

## ORDER

ROGERS, District Judge.

The above-mentioned cases are more in a series of lawsuits brought by the railroads operating in the State of Kansas alleging that the defendants are violating Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), now codified at 49 U.S.C. § 11503. These cases are presently before the court upon the plaintiffs' motions for preliminary in-

junction. The court has taken evidence and heard arguments on these motions and is now prepared to rule. The court shall issue this rather short order and then follow it up in the next few days with a more detailed memorandum. This procedure will enable the plaintiffs to pay the first half of their 1982 taxes, which are due on December 20, in a timely fashion.

In the past, the railroads have sought relief under Section 306 of the 4–R Act for the 1979, 1980 and 1981 tax years. In the instant cases, the railroads seek tax relief for the 1982 tax year. In *Atchison, Topeka & Santa Fe Railway Co. v. Lennen*, Case No. 82–1562, five interstate railroads seek equalization relief under Section 306 similar to that requested in prior actions. In *Burlington Northern Railroad Co. v. Lennen*, Case No. 82–1561, six interstate railroads seek equalization relief under Section 306 as well as relief from alleged overvaluation.

The court shall first consider the issue of equalization relief. The parties have stipulated that the court may consider the evidence presented in the 1981 tax case on the issue of equalization relief for the purposes of determining that issue in these cases. Based upon that evidence, the court will sustain the plaintiffs' motions for preliminary injunction on their request for equalization relief and enter an order similar to those entered in the 1981 tax case.

The court shall now consider the issue of valuation. In prior cases, the railroads have accepted, for the purposes of their Section 306 cases, the defendants' system valuations of their property. In Case No. 82–1561, the railroads do challenge the defendants' 1982 system valuations and allege that those valuations substantially exceed true market value. The railroads assert that the overvaluations occurred in apparent retaliation for the relief granted to them by this court in their 1980 tax case. The defendants have argued that the court has no jurisdiction under Section 306 to consider the proper valuation of the railroads.

After carefully examining the issue of valuation, the court finds from a thorough review of the legislative history of Section 306 that Congress did not generally intend the courts to examine the issue of the valuation of the railroads in actions brought under Section 306. However, we do believe that the court has jurisdiction to consider a situation where a state attempts to circumvent Section 306 by overvaluing a railroad in retaliation for past relief accorded under Section 306 of the 4–R Act. After carefully reviewing the evidence presented in this case, we do not find that the railroads have demonstrated reasonable cause to believe that a violation of Section 306 has occurred on the issue of valuation. The railroads have failed to adequately show that any increase in the valuation of their rail transportation property was due to improper motivation by the defendants. Further, even assuming that the court could consider an ordinary overvaluation case under Section 306, we do not find that the railroads have shown that the defendants overvalued their property under the guidelines established by Kansas law. In sum, we refuse to grant any relief to the plaintiffs based on alleged overvaluation. We intend to elaborate upon these findings in our later memorandum.

IT IS THEREFORE ORDERED that the plaintiffs' motion for a preliminary injunction in Case No. 82–1562 be hereby granted.

IT IS FURTHER ORDERED that the plaintiffs' motion for a preliminary injunction in Case No. 82–1561 be hereby granted in part and denied in part.

IT IS FURTHER ORDERED that defendants, their successors, their agents or employees, and those in active concert or participation with them are preliminarily enjoined and restrained until further order of this court, from collecting those portions of the property tax payments from the plaintiff railroads that are in dispute in this litigation; the portion in dispute amounts to 61% of the plaintiffs' 1982 property taxes. The defendants, their agents or employees, and those in active concert or par-

ticipation with them shall refrain from taking any action to collect those portions of plaintiffs' first half 1982 taxes that are in dispute in this litigation or to penalize the plaintiffs for their failure to pay any portion of the taxes withheld with the court.

The defendants are advised that this injunction applies to the collection of taxes assessed on all railroad transportation property owned by the following plaintiffs:

> The Atchison, Topeka, and Santa Fe Railway Company; Burlington Northern Railroad Company; Chicago and Northwestern Transportation Company; Chicago, Rock Island, and Pacific Railroad Company; The Kansas City Southern Railway Company; The Kansas and Missouri Railway and Terminal Company; Kansas City Terminal Railway Company; Missouri-Kansas-Texas Railroad Company; Missouri-Pacific Railroad Company; St. Louis-Southwestern Railway Company; Union Pacific Railroad Company; and St. Joseph and Grand Island Railway Corporation.

Plaintiff, Chicago, Rock Island, and Pacific Railroad Company is unable to tender payment of any part of its taxes because of proceedings for reorganization of the company pending in the United States District Court for the Northern District of Illinois, Eastern Division.

IT IS FURTHER ORDERED that this injunction shall apply to the county treasurers of the State of Kansas and they shall refrain from taking any action to collect plaintiffs' first half 1982 property tax or to penalize the plaintiffs for their failure to pay any portion of the taxes withheld.

IT IS FURTHER ORDERED that each of the plaintiffs, with the exception of the Chicago, Rock Island and Pacific Railroad Company, submit a verified financial statement establishing sufficient net worth to indemnify the defendants and all affected Kansas counties from any damages or taxes later determined to be due should this preliminary injunction be found to have been wrongfully obtained in whole or in part.

IT IS FURTHER ORDERED that this preliminary injunction shall be effective until further order of the court.

IT IS FURTHER ORDERED that the clerk of the court serve this order on all of the county treasurers in the State of Kansas, in addition to the parties in this case.

IT IS SO ORDERED.

## SUPPLEMENTAL OPINION

ROGERS, District Judge.

On December 1, 1982, this court issued an abbreviated order deciding the pending motions for preliminary injunction filed by the plaintiff railroads in the above-mentioned cases. In that order, we promised that a more detailed memorandum on the issues decided in the order would follow. This memorandum discusses those rulings.

### BACKGROUND

In the instant cases, eleven interstate railroads seek relief under Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), now codified at 49 U.S.C. § 11503. Section 306 prohibits discriminatory state taxation of railroads and provides that rail transportation property may not be assessed at a higher ratio of assessed value to true market value than the ratio of assessed value to true market value at which commercial and industrial property within the state is assessed. These cases were originally filed separately, each by a different group of plaintiff railroads. On September 21, 1982, we consolidated these cases for the purposes of discovery and trial pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. In order to fully understand this court's order of December 1, 1982, and this memorandum, it is necessary to examine each of these cases. The plaintiffs in *Atchison, Topeka & Santa Fe Railway Co. v. Lennen*, No. 82–1562, consist of the following interstate railroads: Atchison, Topeka and Santa Fe Railway Company; Chicago and North Western Transportation Company; Chicago, Rock Island and Pacif-

ic Company [1]; Kansas City Terminal Railway Company; and St. Louis Southwestern Railway Company (hereinafter referred to collectively as the "Santa Fe plaintiffs"). The plaintiffs in *Burlington Northern Railroad Co. v. Lennen*, No. 82–1561, include these interstate railroads: Burlington Northern Railroad Company; Missouri Pacific Railroad Company; Kansas City Southern Railway Company; Kansas and Missouri Railway and Terminal Company; Union Pacific Railroad Company including the St. Joseph and Grand Island Railway Company; and Missouri-Kansas-Texas Railroad Company (hereinafter referred to collectively as the "Burlington Northern plaintiffs"). The defendants in each case are identical. Named as defendants are: C. Michael Lennen, Secretary of Revenue of the Department of Revenue of the State of Kansas; Phillip W. Martin, Director, Division of Property Valuation of the Department of Revenue of the State of Kansas; and the Department of Revenue of the State of Kansas, an administrative agency of the State. In both cases, the court has allowed certain county officials to intervene.

The claims made by the Santa Fe plaintiffs are identical to those made in previous actions brought under Section 306 of the 4–R Act in this court in 1980 and 1981 by the railroads operating in Kansas.[2] These railroads seek equalization relief under Section 306. They contend that the defendants have assessed their property in 1982 at a higher ratio of assessed value to true market value than other commercial and industrial property within the State of Kansas. The Santa Fe plaintiffs seek an order prohibiting the defendants from assessing or taking any action to collect 1982 taxes based on assessments that exceed those permissible under law. Presently, these railroads seek a preliminary injunction preventing the defendants and their agents from collecting that portion of their first half 1982 taxes [3] based on assessments that exceed those permissible under Section 306.

The claims made by the Burlington Northern plaintiffs are slightly different. Like the Santa Fe plaintiffs, they seek equalization relief. However, in addition to equalization relief, they seek valuation relief. They contend that the defendants substantially overvalued their property in 1982. This case marks the first time in a Section 306 case before this court that the railroads have contended that the defendants overvalued their rail transportation property. In the past, the railroads have accepted, for the purposes of their Section 306 cases, the defendants' unit valuations of their property. At the present time,

---

**1.** William G. Gibbons is also a named plaintiff in this case. He is the duly appointed and acting trustee of the property of the Chicago, Rock Island and Pacific Railroad Company by virtue of an order of the United States District Court for the Northern District of Illinois, Eastern Division, entered on March 28, 1975, in Case No. 75 B 2697.

**2.** In 1980, five different actions were filed by the railroads operating in Kansas seeking relief from discriminatory assessments of property taxes on rail transportation property within the State of Kansas under Section 306. These cases were consolidated by this court and are referred to as *Atchison, Topeka & Santa Fe Railway Co. v. Lennen*, Nos. 80–4172, 80–4173, 80–4176, 80–4181, 80–1690 [hereinafter referred to as the "1980 tax case"]. On April 15, 1982, this court, 552 F.Supp. 1031, after a lengthy trial, entered its final order in the 1980 tax case. In that order, the court determined that the provisions of Section 306 had been violated and enjoined the defendants and their agents from assessing and taxing plaintiffs' rail transportation property for the 1980 tax year at a ratio of assessed value to true market value higher than 12.2 percent, which we later amended to 12.4 percent. This decision is currently on appeal.

In 1981, all of the railroads operating in Kansas again filed suit in this court seeking relief under Section 306. This case, *Burlington Northern Railroad Co. v. Lennen*, No. 81–1595 [hereinafter referred to as the "1981 tax case"], remains pending in this court. We have entered two preliminary injunctions in the case in favor of the railroads but a trial of the case has not yet occurred. It is anticipated that this case will not proceed any further until a decision is reached by the Tenth Circuit Court of Appeals on the 1980 tax case.

**3.** Under Kansas law, property taxes are paid in two installments. The first half of a taxpayer's property tax is due on December 20. The second half of the tax is due on June 20. K.S.A. 79–2004.

these railroads seek a preliminary injunction preventing the defendants and their agents from collecting that portion of their first half 1982 taxes based on assessments and valuations that exceed those permissible under Section 306.[4]

On November 23, 1982, this court began hearing evidence on the plaintiffs' motion for preliminary injunction filed in each case. This evidence was eventually concluded on November 29 and we issued the order which preceded this memorandum on December 1, 1982. As we did in our earlier order, we will divide up our discussion in this memorandum in terms of the plaintiffs' request for equalization relief and the plaintiffs' request for valuation relief.

## EQUALIZATION RELIEF

The parties have stipulated that the court may consider the evidence presented in the 1981 tax case on the issue of equalization relief for the purposes of determining that issue in these cases. The parties have so agreed because no new additional evidence exists at this time due to the fact that the 1982 Kansas sales assessment ratio study is not yet available. In the 1981 tax case, the plaintiff railroads submitted a sales assessment ratio study prepared by Dr. Frederick Ekeblad that was based upon information from the 1981 Kansas sales assessment ratio study. This study showed that commercial and industrial property in Kansas was assessed at approximately 11.7 percent of true market value. The defendants submitted evidence which demonstrated another method of calculating the assessment ratio of commercial and industrial property in Kansas. It was recognized by the defendants' expert witness, Dr. Darwin Daicoff, during the hearing in the 1981 tax case, that the methodology suggested by the defendants was not in accordance with this court's rulings in the 1980 tax case. Finding the plaintiffs' evidence in accordance with our decision in the 1980 tax case, we found that the

plaintiffs had demonstrated reasonable cause to believe that a violation of Section 306 had occurred. Based upon that same evidence, the court makes the same finding in this case. The court will sustain the plaintiffs' motions for preliminary injunction on their request for equalization relief.

## VALUATION RELIEF

As aforementioned, the Burlington Northern plaintiffs contend that the defendants overvalued their property in 1982. They contend that the procedures used by the Division of Property of Valuation (hereinafter referred to as "DPV") to value railroads in the State of Kansas are irrational and result in excessive overvaluation. They further assert that they were overvalued in 1982 in retaliation for relief they were awarded by this court in the 1980 tax case. These railroads suggest that the court lower their 1982 unit valuations to their 1981 unit valuations. The defendants have strenuously objected to the court examining the "true market value" of each of the Burlington Northern plaintiffs.

The plaintiff railroads argue that the plain language of Section 306 requires the court to first make a determination of the true market value of a railroad system's property before conducting the equalization of railroad property taxes with all other commercial and industrial property taxes. Moreover, they contend that this court has already determined, in the 1980 tax case, that the issue of valuation of the railroads is an appropriate one in a Section 306 case. Further, the railroads assert that the defendants are now taking a contrary position on this issue to the one they asserted in the 1980 tax case. They contend that the defendants, in that case, argued that the question of the "true market value" of the railroads was indeed an issue in a Section 306 action.

It is the defendants' position that the court has no jurisdiction under Section 306

---

**4.** At the hearing on the plaintiffs' motions for preliminary injunction, counsel for the Burlington Northern plaintiffs informed the court that plaintiff Kansas and Missouri Railway and Terminal Company did not wish to be included

with the other railroads seeking a preliminary injunction on the valuation issue. Thus, for the purposes of the preliminary injunction, they seek only equalization relief.

to consider the unit valuations of the plaintiff railroads. Essentially, they contend that the valuations determined by them are the valuations against which this court must apply the standards of Section 306. The defendants assert that the legislative history of Section 306 demonstrates that Congress did not intend to extend Section 306 to valuation questions. Further, they submit that the railroads, in urging the court to redetermine their valuations, are requesting that the court ignore the prohibition against the federal courts assessing or levying taxes established in *Moses Lake Homes, Inc. v. Grant County*, 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961). Finally, the defendants suggest that the plaintiff railroads have "grossly" misconstrued the position they took on valuation in the 1980 tax case.

The court did consider, at least to a certain extent, the issue of valuation in the 1980 tax case. At that time, however, the issue was raised in a slightly different context. The defendants and the county intervenors had, from the outset of the 1980 tax case, contended that the court could not compare the unit valuation method of appraisal used on railroads with the segregated valuation appraisal approach used on other commercial and industrial property in Kansas. In this regard, they argued that it was necessary for the court to determine the true market value of each railroad under a segregated approach in order to be able to compare it with other commercial and industrial property in the State of Kansas under the provisions of Section 306. The defendants admitted that they had properly valued the plaintiff railroads under the unitary method but asserted that the segregated approach would achieve a different value. In a motion in limine filed prior to the trial of the 1980 tax case, the railroads sought an order prohibiting the introduction of evidence on their value be-

cause valuation was not an issue in the case. After a review of the legislative history on the particular point presented, we declined to hold as a matter of law that the defendants could not present evidence based on their arguments regarding valuation. This court must note that this ruling was made in part in an effort to hear as much evidence as possible in this relatively new area of law. After hearing all of the evidence in the case, we concluded that the Director of the DPV had properly valued the plaintiffs' property under the unitary method of appraisal and accurately arrived at the true market value of the plaintiffs' property for the 1980 tax year. Considering the context in which the issue was raised in the 1980 tax case, we do not consider our earlier ruling determinative of the issue presented herein. We now move to a thorough and detailed discussion of the issue of valuation in an action brought under Section 306.

Section 306 provides that a state is engaging in unlawful discrimination if it assesses:

> transportation property at a value which bears a higher ratio to the *true market value* of such transportation property then the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the *true market value* of all such other commercial and industrial property. (Emphasis added.)

The issues of "true market value" and valuation of rail transportation property were raised and discussed in the reports and during the hearings that preceded the passage of Section 306 of the 4–R Act.[5] It appears that Congress first discussed the concept of true market value in 1968 when it was considering S. 927, one of the several precursors to Section 306. In a report

---

**5.** Before passing Section 306, Congress had considered proposals virtually identical to it since 1961. It is well-established that legislative proposals which were not enacted, but which antedate statutory provisions under consideration by a court, are relevant and material to a complete understanding of the statute. *United*

*States v. Enmons*, 410 U.S. 396, 404 n. 14, 93 S.Ct. 1007, 1012 n. 14, 35 L.Ed.2d 379 (1973); *Transcontinental & Western Air, Inc. v. Civil Aeronautics Board*, 336 U.S. 601, 605–06 n. 6, 69 S.Ct. 756, 758 n. 6, 93 L.Ed. 911 (1948); *State of Arizona v. Atchison, Topeka & Santa Fe Railroad Co.*, 656 F.2d 398, 404 n. 6 (9th Cir.1981).

on that bill, the Senate Committee on Commerce stated:

> In order to avoid any question as to the meaning of the phrase "true market value" as used in S. 927, the committee accepts the definition of this phrase as set forth in appendix B attached to this report. The committee intends by the phrase "true market value" the meaning set forth in appendix B.

S.Rep. No. 1483, 90th Cong., 2nd Sess., p. 10 (1968).

Appendix B to S.Rep. No. 1483 stated as follows:

> True market value is the goal generally sought by all tax assessors either as the assessment figure or as a starting point from which final assessments of less than true market value may be computed. In an authoritative treatise published by the National Association of Tax Administrators, the following statement appears:
>
> "The statutes of the several States prescribing the value standard for tax purposes use such terms as 'fair market value,' 'fair cash value,' 'full market value,' and the like. All of these terms are synonymous; they mean nothing more and nothing less than what we mean in this report by the term 'market value' or the word 'value' without a qualifying adjective."
>
> These have been judicially defined in numerous cases. *New York Bay R. Co. v. Kelly,* 22 N.J.Misc. 204, 37 A.2d 624, 628 (1944); *Fort Worth & D.N. Ry. Co. v. Sugg* (Tex.Civ.App.), 68 S.W.2d 570, 572 (1934); and *Guyandotte Valley R. Co. v. Buskirk,* 57 W.Va. 417, 50 S.E. 521, 526 (1905).
>
> The proportion of "true market value" at which assessments are finally fixed varies among the several States. In some States, the law requires assessment at true market value, in others at 60 percent thereof, in others at 35 percent, et cetera.
>
> Railroad property in most of the States is valued and assessed as a unit; that is, the whole system as it exists in 8, 10, or 15 States is valued; this value is distributed among the several States on the basis of recognized allocation factors; and then, in turn, the value in a particular State is apportioned among the several taxing districts in that State on the basis of mileage. In other words, when railroads are assessed as a unit the total value is first determined and then apportioned; the total assessment is not determined by adding the assessed value of individual items that make up the railroad plant.
>
> As to the few States in which railroad property is locally assessed there is no specific information concerning the assessment methods.
>
> *S. 927 does not suggest or require a State to change its assessment standards, assessment practices, or the assessments themselves. It merely provides a single standard against which all affected assessments must be measured in order to determine their relationship to each other. It is not a standard for determining value; it is a standard to which values that have already been determined must be compared. This standard is "true market value" (also the generally accepted standard for assessment purposes) and the requirement is that carrier property be assessed at the same proportion of such value as the proportion at which all other property subject to the same tax rates is assessed.* (Emphasis added.)

The language contained in Appendix B that S. 927 was not a standard for determining value but was a standard for comparing values already determined had apparently been adopted from a statement given previously by James N. Ogden, Vice President and General Counsel of the Gulf Mobile and Ohio Railroad Company, during hearings before a Senate subcommittee on S. 927 on August 7 and 8, 1967. Speaking on behalf of the Association of American Railroads, Mr. Ogden had stated:

> ... *S. 927 does not suggest or require a State to change its assessment standards, assessment practices, or the as-*

sessments themselves. It merely provides a single standard against which all affected assessments must be measured in order to determine their relationship to each other. *It is not a standard for determining value; it is a standard to which values that have already been determined must be compared.* (Emphasis added.)

Hearings Before the Subcommittee on Surface Transportation of the Committee on Commerce on S. 927, 90th Cong., 1st Sess., p. 29 (1967).[6]

On July 30, 1969, hearings were conducted before the Senate Subcommittee on Surface Transportation of the Committee on Commerce on S. 2289, the successor to S. 927. During these hearings, the question of whether the federal courts would be empowered to reexamine the valuation of a railroad's property arose on two occasions. The issue was first raised during the following colloquy between Wyoming Senator Clifford P. Hansen and Phillip M. Lanier, Vice President-Law, Louisville and Nashville Railroad Company, who at the time was speaking on behalf of the Association of American Railroads:

Senator HANSEN. Is this same formula—this same three-factor formula in use for the purposes of this study throughout the country, or is this only the way it is done in Wyoming?

Mr. LANIER. *The formula varies from State to State and we are not dealing with the valuation question. This is not our problem. We speak only of the equalization of the tax rate.* (Emphasis added.)

Hearings Before the Subcommittee on Surface Transportation of the Committee on Commerce on S. 2289, 91st Cong., 2nd Sess., p. 39 (1969).

The issue was again raised in a question by Senator Hansen to Broley E. Travis, a consulting valuation engineer:

Senator HANSEN. Thank you very much, Mr. Travis. I'm sure the commit-

tee will be impressed with your observations.

You have been in this business for a long time, and I think you have made a most commendable contribution toward a more complete understanding of the problem.

Thank you, sir.

I do have one question, Mr. Travis. It has been handed to me. An objection to this legislation which has come to my attention is the possibility that the bill would require the Federal courts to review and determine the correctness of not only valuation procedures and actual valuation results for the carriers, but also the entire work of each assessing agency with respect to all properties. This is so, it is alleged, because the bill contemplates the determination of values. This committee's report of last year considers this problem in appendix B, but for the record, I would like your views on the validity of this argument.

Mr. TRAVIS. Well, I believe, it would be my impression, being an engineer, and not an attorney, *that the Federal court would have to review both the valuation as made by the administrative officers, and the equalization.*

Now, it is the duty of the complaining taxpayer to prove the valuation is too high, and it is his duty to prove what the assessment ratios are in the county or the State or whatever the division is that he is operating in, in which he is complaining of such matters.

So the burden of proof is upon the taxpayer to present such evidence to the court in order to guide the court in its judgment.

Senator HANSEN. Is it your understanding that this bill could very well contemplate and recognize the continuance of a situation wherein one State might value pieces of property and miles of track, say, at twice the amount at which another State might fix the value,

6. Mr. Ogden had first made these comments on July 28, 1964, in a hearing before the House of Representatives' Subcommittee on Transporta-

tion and Aeronautics of the Committee on Interstate and Foreign Commerce on H.R. 736, 10169, forerunners of Section 306.

and yet the action of neither State would be discriminatory if all of the other properties within the two respective States were assessed in a comparable fashion?

Mr. TRAVIS. *As a technician, to me, assessment has to start with valuation. That's where you start. And you find the market value of the property, whether you are assessing a house or a railroad.* That's the yardstick that is common to every place. (Emphasis added.)

*Id.* at p. 59.

In the report that followed on S. 2289, the Senate Committee on Commerce rejected the viewpoint of Mr. Travis and once again adopted the view that S. 2289, like S. 927, was not intended as a standard for determining value. *See* S.Rep. No. 91–630, 91st Cong., 1st Sess., pp. 10, 25–26 (1969). The issue of valuation was again raised in 1970 in a hearing before a House of Representatives' subcommittee on H.R. 16245. Philip M. Lanier told these members of Congress that the bill did not give the federal courts the right to redetermine valuation:

Mr. LANIER. *On the valuation— this bill would not deal with valuation being standard. The standards and methods of valuation that any State wishes to use would be totally unaffected by this legislation.*

The short answer, if I may give it this way, and I think it will be clear, is that for valuation purposes different kinds of property put to different uses do require different methods of valuation. And the method of valuation applied to a railroad is quite different from that which is applied to a residence, a farm, factory, whatever it may be.

And that is appropriate because it is the way to get at the real value. There is nothing in this legislation—and we have no brief here to alter that—it is only in the area of equalization of the computed value that this legislation speaks. That is where our problem is.

Mr. [Brock] ADAMS [Representative from the State of Washington]. On page 2 of the bill it says, "The assessment"— which is what the tax collector comes in on—"for purposes of a property tax"— and that is all I am talking about here now—"owned or used by a common carrier at a value which bears a higher ratio to the true market value of such transportation property than the assessed value of all other property in the assessment jurisdiction in which is included such taxing district and subject to a property tax levy bears to the true market value of all other such property."

That appears to me that you are taking into account both valuation and assessment.

Mr. LANIER. I think I can answer it this way.

Without regard to this legislation, assuming it is enacted, without regard to it the assessing authority for the railroads puts a value—a fair market value, true market value, the words means the same—on that railroad property and the local assessor in the towns you refer to puts a true market value on the residences. *After that is done, this bill would come into play.*

Mr. ADAMS. But that help could not —if, for example, vacant property in that area with no buildings on it was assessed at, we will say, 100 by 100 lot, would be assessed at $5,000—with a building on it, of course, valuation is going up—so then if your railroad property was assessed at more than that, under this bill—this is what I am asking you—I think you probably would have an automatic lawsuit that would say the value of a piece of real property with two rails on it and no other improvements should not be any higher than either vacant property plus the value of the rails.

Unless, of course, you are using this unitary system that you mentioned which would take into account a lot of other factors, and since Mr. Smith is talking about real property and assessment and the bill, I am just asking you how it works.

Mr. LANIER. Let us assume that the vacant lot is assessed at $5,000. That is the fair market value of that lot. Now, in Washington the equalization ratio is 50 percent.

Mr. ADAMS. In Washington it is 50 percent. There is a fight going on because nobody is assessing at 50 percent. In some counties it is 20 and in others it is 32 and in others it is 56. If you have a lot of lumber in a particular county, a lot of trees, you get a low assessment rate—

Mr. LANIER. Let's take the 50 percent then, so that that vacant lot actually carries a tax on $2,500. Now let us assume that a portion of the right-of-way of the railroad equivalent in area in that town to the vacant lot carries a value, fair market value determined by the State assessing authority of $20,000, if it is equalized at 50 percent, the tax goes against only $10,000. That is all this bill requires, and that is all we ask for.

Because we are speaking in terms of uniformity of the equalization ratio, not uniformity of the result in dollars of value or in dollars of tax, *but only that once the fair market value is determined, the equalization ratio will be the same.* And since you would have a 50 percent ratio in each instance, we would have absolutely no complaint and no grounds for complaint. (Emphasis added.)

Hearing Before the Subcommittee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce on H.R. 16245, 91st Cong., 1st Sess., p. 138–39 (1970).

From the aforementioned legislative history of Section 306, several things are apparent. Congress on several occasions considered the issue of whether this legislation to make unlawful discriminatory taxation against rail transportation property would require the federal courts to review and determine the correctness of the valuation procedures and the actual valuation results for the railroads by each state assessing agency. It appears clear the Congress did not intend to place this burden on the fed-

eral courts. Discriminatory valuation of the railroads, although mentioned on a few occasions during the course of the passage of Section 306, was not the problem that Congress sought to remedy in the passage of Section 306. The purpose of the bill was to provide relief for the railroads from discriminatory taxes through improper assessments or rates. We simply do not believe that Congress intended for the federal courts to become involved in establishing new or better procedures for the states in the valuing of railroads. Section 306 simply provides a standard to which values that have already been determined must be compared. Accordingly, we believe that the issue of the appropriate "true market value" of a railroad is generally not to be an issue in a Section 306 case.

Other courts which have considered this issue have arrived at conclusions similar to that reached by this court. In *Louisville & Nashville Railroad Co. v. Louisiana Tax Comm.*, 498 F.Supp. 418 (M.D.La.1980), the defendant argued that the unit method they utilized to value railroads produced a lower value than other appraisal methods utilized on commercial and industrial property. The court refused to hear evidence based on defendant's argument, stating:

> The Federal Statute [Section 306] is quite clear. It leaves the States the appraisal method or methods to be utilized in determining 'fair market value' or 'true market value.' It simply provides that after fair market value has been determined the States may not discriminate against rail transportation property and if the discrimination exceeds the 5% prohibition, then the District Courts may grant injunctive relief.

*Id.* at 421.

In *Burlington Northern Inc. v. Department of Revenue of the State of Montana*, No. CV–80–139–BLG (D.Mont., unpublished, 7/26/82), the issue of the valuation of rail transportation property was raised and thoroughly considered. In that case, the defendant had sought to show that it had valued the plaintiff railroads' property at less than true market value. The rail-

roads had argued that the defendant should be estopped from discrediting valuations based upon the mandates of Montana taxation statutes and the defendant's own regulations. However, in addition, the railroads had raised the valuation issue in anticipation of its use as an affirmative defense by the defendant. The court made the following findings:

The Court further believes that the DOR should not be permitted to, in essence, revalue and reappraise the railroad property under the guise of seeking true market value for such property. The DOR must utilize and adopt the unit valuation of the railroads which it certified in 1980.

. . . . .

We find that valuation is not an issue which should be addressed in this case. Each party must accept the property valuations actually determined by the DOR.

The court then concluded:

Section 306 affords each state broad discretion concerning methods of valuation and appraisal in property taxation. Thus, market value determinations are left to a state's discretion provided the result of the valuation process is not discriminatory against railroads. *State of Arizona v. Atchison, T. & S.F. R.*, 656 F.2d at 408 n. 9. *Louisville & Nashville Railroad Company v. Louisiana Tax Commission, supra.*

The DOR has previously determined the true market value of the railroad through the unit valuation method. It can not now search for a "new" or "more correct" market value in order to pass scrutiny under § 306. Section 306 gives the DOR options regarding how market value is determined. Once market value is found and the taxation scheme is then found to be discriminatory against the railroads, the Act does not allow the DOR to then seek a new method of valuation in an effort to fall within the 5% limits of § 306(c). Such post-comparison tactics are, at best, an illusory compliance with § 306.

In sum, we believe that Congress did not intend the federal courts to become involved in the issue of valuation of the railroads. In light of this ruling, the court finds it unnecessary at this point in the opinion to consider the contentions raised by the defendants regarding the doctrine established in *Moses Lake Homes, Inc. v. Grant County, supra.*

The court does wish to note what we believe to be an exception to the general rule that Congress did not intend the federal courts to get involved in valuation problems in Section 306 cases. We do believe that a court, under the equity power vested in the federal courts by Congress under Section 306, could examine the valuation established by a state where a railroad has shown that a state overvalued its property in retaliation for past relief accorded under Section 306. In passing Section 306, Congress provided the federal courts with significant equity power to remedy discriminatory taxation of rail transportation property. The court has examined in some detail this grant of equity power in the 1980 tax case. In that case, we found the grant of equity power under Section 306 insufficient to award retroactive relief to the railroads for alleged discriminatory taxation in 1979. We reached that decision based upon the language of Section 306 and the legislative purpose of the statute. We do not find the considerations noted in that case to be applicable here in considering whether a court may remedy, under its broad equity power, overvaluation in retaliation for past relief accorded under Section 306. Nor do we find the creation of this exception to contravene the *Moses Lake* decision. In that case, the Supreme Court held that a federal court may not make the adjustment necessary to make an invalid tax valid. The courts are limited to determining whether existing taxes are valid, and have no power to substitute a valid tax for the invalid tax. Here, the court is simply fashioning an equitable remedy to protect a substantive right which Congress has established. This right is the right of a railroad to be free of a discriminatory assessment. The *Moses Lake* decision did not suggest that

federal courts could not fashion measures to achieve this result. This court would only be protecting a right given under federal law and we do not find *Moses Lake* to prohibit this action.

Of course, the Burlington Northern plaintiffs do contend that the defendants overvalued their property in 1982 in retaliation for relief they received in the 1980 tax case. To determine whether retaliation was present in the defendants' 1982 valuations of these five railroads, it is necessary to consider the testimony and evidence that was presented by the parties. The court heard from three witnesses, the Director of the DPV, a member of the staff of the DPV, and the plaintiffs' expert witness.

Under Kansas law, the fair market value of the plaintiffs' rail transportation property is determined by the unitary method of appraisal, i.e., valued as a "going concern." Specifically, K.S.A. 79–5a04 provides, in pertinent part:

The division of property valuation in determining the fair market value of public utility property shall, where practicable, determine the unit valuation, allocated to Kansas, and in doing so shall use generally accepted appraisal procedures developed through the appraisal process and may consider, including but not by way of exclusion, the following factors:

(1) Original cost.

(2) Original cost less depreciation or reproduction cost less depreciation, or both, or replacement cost new less depreciation, except that where either method is used proper allowance and deduction shall be made for functional or economic obsolescence and for operation of nonprofitable facilities which necessitate regulatory body approval to eliminate.

(3) The market or actual value of all outstanding capital stock and debt.

(4) The utility operating income, capitalized in the manner and at such rate or rates as shall be just and reasonable.

(5) Such other information or evidence as to value as may be obtained that will enable the property valuation department to determine the fair market value of the property of such public utility.

The fair market value of affiliated properties separately assessed, or the nonoperating properties of such companies, or both, shall be ascertained and determined as nearly as possible and deducted from the total unit value of the properties of such companies if such properties are included in the unit value. Except for the property of any entity enumerated in subsection (b) of K.S.A. 79–5a01, as amended, and insofar as it is practicable to do so, the same method of evaluating the properties of the companies separately assessed or nonoperating properties, or both, shall be used as was used in determining the unit value of such companies. All property of any entity enumerated in subsection (b) of K.S.A. 79–5a01, as amended, shall be valued by the county or district appraiser in the same manner as provided by law for the valuation of the same type or class of property in the county.

Charles Burkhart, supervisor of the utility bureau within the DPV, testified that the staff of the DPV, under his supervision, formulates the figures for the various factors articulated in K.S.A. 79–5a04. The staff arrives at the figure on each factor, commonly referred to as an "indicator of value," based essentially upon information received from each railroad. These indicators of value for each railroad, along with the DPV's indicators of value for each railroad for the two preceding years, are then sent to defendant Phillip Martin, the Director of the DPV. Defendant Martin examines the various indicators of value, correlates them, and then arrives at a final unit value for each railroad.

Dr. Arthur Schoenwald, a consultant in the area of valuing railroads, testifying on behalf of the railroads criticized the work of the DPV. As to each railroad, he found fault with the DPV's indicator of value figures and their ultimate correlated value. His criticisms centered primarily around the procedures utilized by the staff and the

Director of the DPV to achieve their figures.

■ After carefully considering the evidence on overvaluation, we do not find that the plaintiffs have demonstrated reasonable cause to believe that the defendants retaliated against them for relief received in the 1980 tax case. We reach this conclusion based on several facts adduced during the evidence that was presented. The procedures used by the defendants to arrive at the 1982 unit valuations were identical to the procedures used by the defendants for over ten years to value railroads operating within the State of Kansas. Further, these procedures were identical to those used to value the other railroads within the State of Kansas in 1982. It appears that the railroads have long been dissatisfied with the procedures used by the defendants to value railroad transportation property in Kansas. The procedures utilized in 1982 certainly were not just instituted in order to create a higher value for the railroads. The court found the explanations offered by defendant Martin for the increases in the 1982 valuations of the Burlington Northern plaintiffs to be credible. In sum, we find that the plaintiffs have failed to adequately demonstrate any retaliation by the defendants in their 1982 valuations of the Burlington Northern plaintiffs. Further, even if we were to consider simply the issue of overvaluation, we do not find that the plaintiffs demonstrated reasonable cause to believe that the defendants, under the standards provided under Kansas law, overvalued the plaintiffs' property in 1982. In sum, we refuse to grant any relief to the Burlington Northern plaintiffs based on alleged overvaluation.

Our decision, however, does not mean that the railroads are without a remedy to correct overvaluation of their property by the defendants. The railroads have several avenues available to them under Kansas law to challenge overvaluation by the defendants.

The railroads receive their first opportunity to challenge overvaluation in Kansas following the receipt of their final correlated unit valuations from the Director of the DPV. At this time, each railroad has an opportunity to request a hearing with the Director in order to discuss, criticize or request a change in the final valuation figure. After the hearing, the railroads are notified of their final unit value. The court recognizes that this is often an ineffective practice for the railroads, particularly when they seek to challenge the procedures utilized by the DPV to make their calculations. However, Kansas law does provide the railroads with an opportunity to challenge their valuation before the Kansas Board of Tax Appeals. K.S.A. 74–2438. Then, if they are not satisfied with the decision reached by the Board of Tax Appeals, they may seek relief in state court. K.S.A. 74–2426.

Here, the Burlington Northern plaintiffs did not challenge their valuations before the Board of Tax Appeals within the prescribed time limits of K.S.A. 74–2438. Thus, it appears that the railroads are precluded from challenging their valuations under K.S.A. 74–2438. However, it does appear that an alternative is available to the railroads, the tax protest procedures of K.S.A. 79–2005. K.S.A. 79–2005 allows a taxpayer in Kansas to pay his tax under protest and then challenge the tax before the Board of Tax Appeals. There was some question raised during the instant hearing as to whether the railroads could, like other taxpayers in Kansas, use the pay under protest procedures of K.S.A. 79–2005. This issue arose in the 1980 tax case and we stated the arguments of the parties as follows:

> The plaintiffs contend that a recent amendment (Chapter 315 of the 1980 Kansas Session Laws) to K.S.A. § 79–2005, the Kansas tax protest provision, has eliminated their remedy. The amended version of K.S.A. § 79–2005 contains a new subsection which reads:
>
> (n) *This statute shall not apply to the valuation and assessment of property assessed by the director of property valuation* and it shall not be necessary for any owner of state assessed

property who has an appeal pending before the board of tax appeals, to protest the payment of taxes under this statute solely for the purpose of protecting the right to a refund of taxes paid under protest should that owner be successful in that appeal. (Emphasis added.)

The plaintiffs rely on the language underlined above for their position that subsection (n) forecloses the use of K.S.A. § 79–2005 to the railroads. It is the defendants' position that this subsection, read in its entirety, does not exclude the use of this remedy by the plaintiff railroads. They assert that if plaintiffs' contention were correct, it would be impossible for the owner of state assessed property to pay his taxes under protest. Furthermore, they believe that the plaintiffs' position would make much of subsection (n) contradictory and meaningless.

We concluded:

The court is in full agreement with the defendants when they state that subsection (n) is "not the model of legislative clarity." It is indeed a rather confusing and poorly written piece of legislation. This court believes that subsection (n) must be read as interpreted by the defendants. The legislative history of the amendment to K.S.A. § 79–2005 supports the conclusion that subsection (n) was not intended to eliminate the right of railroads to use the protest and refund procedures of K.S.A. § 79–2005.

Thus, we believe that the railroads have the procedures under K.S.A. 79–2005 available to them as an option to challenge their valuation.

CONCLUSION

This memorandum thoroughly discusses the rulings made in our order of December 1, 1982. We hope it is some assistance in understanding that order.