UNION PACIFIC RAILROAD COMPANY, a Utah corporation; Western Pacific Railroad Company, a Delaware corporation; The Denver and Rio Grande Western Railroad Company, a Delaware corporation; Oregon Short Line Railroad Company, a Utah corporation; Los Angeles & Salt Lake Railroad Company, a Utah corporation; Plaintiffs,

v.

STATE TAX COMMISSION OF UTAH and State of Utah, Defendants.

SOUTHERN PACIFIC TRANSPORTATION COMPANY, Plaintiff,

v.

STATE OF UTAH, et al., Defendants.

Nos. C–82–0998J, C–82–1037J, C–83–1178J, C–83–1118J, C–84–0840J and C–84–0839J.

United States District Court,
D. Utah, C.D.

March 31, 1986.

Leonard J. Lewis and Robert A. Peterson, L. Ridd Larson, Wm. Marshall, Salt Lake City, Utah, Wm. E. Saul, San Francisco, Cal., for plaintiffs.

Bill Thomas Peters and John Avery, Gary Thorup, Asst. Atty. Gen., Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION

JENKINS, Chief Judge.

On February 6 and 10, 1986, these consolidated cases came on for a hearing on

the plaintiff Union Pacific Railroad Company's motion for partial summary judgment and the plaintiff Southern Pacific Transportation Company's motion "pertaining to valuation." Robert A. Peterson appeared on behalf of the plaintiffs in the Union Pacific Railroad Company consolidated cases; L. Ridd Larson and William A. Marshall appeared on behalf of the plaintiff Southern Pacific Transportation Company; Gary R. Thorup appeared on behalf of the State of Utah and the Utah State Tax Commission; and Bill Thomas Peters appeared on behalf of the intervenors, some twenty Utah counties. The court at that time took the matter under advisement. Having reviewed the pertinent statutory and case authority, as well as the briefs and arguments of counsel, the court now enters this memorandum opinion.

## I.

In each of these consolidated cases the plaintiffs, various railroad companies whose tracks pass through Utah, sought to enjoin the state of Utah from collecting a portion of their ad valorem tax assessments for the years 1982–85 on the grounds that those portions constituted unlawful taxes under section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 ("the 4–R Act"), Pub.L. No. 94–210, § 306, 90 Stat. 31, 54 (1976).[1] For each year the court has enjoined the defendants from collecting taxes from the plaintiffs in excess of a given ratio of assessed value to true market value, pending a determination of whether the state's taxing scheme violates section 306. Pending that determination, the railroads have been paying a portion of their tax payments into the treasury of this court.

Section 306 prohibits discriminatory tax treatment of "transportation property," which covers the plaintiff railroads' property at issue in this case. That section makes it unlawful for a state to assess

> transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.[2]

Section 306 gives federal district courts jurisdiction to grant declaratory judgments and equitable relief "as may be necessary to prevent, restrain, or terminate any acts in violation of this section" except that

> no relief may be granted under this section unless the ratio of assessed value to true market value, with respect to transportation property, exceeds by at least 5 per centum the ratio of assessed value to true market value, with respect to all other commercial and industrial property in the same assessment jurisdiction....

Thus, the statute requires this court to compare two ratios: the ratio of the assessed value of "transportation property" to its true market value, and the ratio of the assessed value of all other commercial and industrial property in the "same assessment jurisdiction" to its true market value.[3] That task would seem to require this court to make findings of fact as to (1)

---

1. Rather than filing separate actions for 1985, to request relief from their 1985 tax assessments the plaintiffs have served supplemental complaints in their 1984 actions.

2. Originally codified at 49 U.S.C. § 26c, section 306 was recodified at 49 U.S.C. § 11503 as part of the revised Interstate Commerce Act. *See* Act of Oct. 17, 1978, Pub.L. No. 95–473, § 11503, 92 Stat. 1337, 1445–46. The recodification changed the wording and structure of the original section. Because it was not meant to change the substantive law, *see id.* § 3(a), 92 Stat. at 1466, where the language of the two sections differs in substance, the original language of section

306 controls, *Atchison, Topeka & Santa Fe Ry. v. Lennen,* 640 F.2d 255, 258 (10th Cir.1981). Throughout this opinion, references to the statute are to section 306 and not to its recodification.

3. An "assessment jurisdiction" is defined as "a geographical area, such as a State or a county, city, township, or special purpose district within such State which is a unit for purposes of determining the assessed value of property for ad valorem taxation." Pub.L. 94–210, § 306(3)(b), 90 Stat. at 55 (1976).

the assessed value of the railroads' property, (2) the true market value of the railroads' property, (3) the assessed value of all other commercial and industrial property in the state, and (4) the true market value of all other commercial and industrial property in the state. The court would then have to calculate the two ratios, determine whether they varied by at least five percent and, if they did, grant the railroads relief. That, at least, is the district court's role according to the Eighth Circuit. *See Burlington N. R.R. Co. v. Bair*, 766 F.2d 1222, 1226 (8th Cir.1985). But in this circuit district courts are apparently precluded from determining for themselves the true market value of railroad property, by the Court of Appeals' decision in *Burlington Northern Railroad Company v. Lennen*, 715 F.2d 494 (10th Cir.1983), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984). At least, that is how Union Pacific reads the *Burlington Northern* decision. To test its interpretation of that decision, Union Pacific brought its motion for partial summary judgment (perhaps more accurately characterized as a motion in limine), seeking a ruling that the valuation of the plaintiffs' assets is not at issue in these consolidated cases and that no evidence could be presented as to the true market value of the railroads' "transportation property." Southern Pacific also brought a motion "pertaining to valuation," but it sought a ruling that the true market value of its rail transportation property *is* an issue of fact in these cases.

The question has produced strange bedfellows. The state of Utah and the State Tax Commission are aligned with Union Pacific and the Denver and Rio Grande in support of Union Pacific's motion. The intervening counties, on the other hand, agree with Southern Pacific that this court should reevaluate the state's valuation of the railroads' property, although Southern Pacific is seeking to lower that valuation while the counties want to increase it. To understand the positions of the parties, one

must first understand the state's taxing structure.

## II.

Under Utah law all tangible property in the state (with a few exceptions) "shall be taxed at a uniform and equal rate in proportion to its value...." Utah Const. art. XIII, § 2(1). *See also* Utah Code Ann. § 59–1–1 (1974). For the years 1982 through 1985 all taxable property (except property specifically exempted under article XIII, section 2, of the Utah Constitution) was required by statute to be assessed "at 20% of its reasonable fair cash value...." *See* Utah Code Ann. § 59–5–1 (Supp.1985).[4]

The Utah State Tax Commission assesses certain types of property, including public utilities, mining property and railroad property if the railroad operates in more than one county, as the plaintiffs in these consolidated cases do. *Id.* § 59–5–3. The county assessor assesses all other taxable property. *Id.*

Each year the State Tax Commission is required to conduct "an investigation throughout each county of the state to determine whether all property subject to taxation is on the assessment rolls, and whether such property is being assessed" at the statutory rate. *Id.* § 59–7–13. The commission is empowered to order the county to assess any property that has escaped assessment, to increase or decrease the assessed valuation of any property it finds is not being assessed at the statutory rate, and to order the county to correct the assessed valuation of such property "to make the assessment of all property within the county conform as nearly as may be to" the statutory rate. *Id.*

Utah, like many other states, uses a "unitary" method of assessing railroad property. *See, e.g., Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 552 F.Supp. 1031, 1035 (D.Kan.1982), *aff'd in part and rev'd*

---

**4.** "Reasonable fair cash value" is equivalent to "market value." *See Kennecott Copper Corp. v.*   *Salt Lake County*, 122 Utah 431, 250 P.2d 938, 939–40 (1952).

*in part,* 732 F.2d 1495 (10th Cir.1984). It values the railroad as a unit—as a going concern—rather than valuing each separate item of railroad property. It then determines what percentage of the railroad's total value should be allocated to Utah, based on such factors as the percentage of the railroad's total trackage that runs through the state. Finally, it apportions the total assessment among the counties in which the railroad operates. *See* Utah Code Ann. § 59–6–1(4) (Supp.1985). Although the State Tax Commission assesses and collects the tax on a railroad, the bulk of the revenue ultimately goes to the affected counties, *see id.* § 59–10–20, hence their desire to intervene in these actions.

If either the railroad or a county is dissatisfied with the State Tax Commission's valuation of the railroad's property, it may apply to the commission for a hearing, and the other may be made a party to the hearing "upon a showing of reasonable cause." *Id.* § 59–7–12. "At the hearing the tax commission may increase, lower or sustain the assessment, if the commission finds an error in the assessment or if it is necessary to equalize the assessment with other similarly assessed property." *Id.*

The Denver and Rio Grande has not contested the state's valuation of its property for 1982 and 1983 but has an administrative hearing pending before the State Tax Commission for 1984. Union Pacific, on the other hand, has valuation proceedings pending in state actions for at least 1982 and 1984.[5] Southern Pacific has settled its differences with the state for 1982 and 1983 but has protested the state's valuation for 1984. As of the date of the hearings on these motions, apparently none of the railroads had challenged its 1985 assessment, but all were likely to do so. They have

until April 10, 1986, to raise their objections. *See id.* § 59–7–12.

### III.

■ Thus, under Utah's statutory scheme as it existed from 1982 through 1985, the ratio of assessed value to true market value should have been the same for both railroad property and all other commercial and industrial property in the state, and both ratios should have equaled .20, or twenty percent.

The railroads claim that the state has been engaged in both de jure and de facto discrimination against them in that it has been assessing railroad property at twenty percent while assessing all other commercial and industrial property at lower rates, ranging from about ten percent in 1982 to some fifteen percent in 1985. Part of the alleged discrepancy is due to allegedly discriminatory statutes, one of which required county assessors (who assess most "other commercial and industrial property" in the state) to take eighty percent of the value of certain property (that valued by the "comparable sales or cost appraisal" methods—primarily realty) as its "reasonable fair cash value for purposes of assessment," Utah Code Ann. § 59–5–4.5, but did not accord railroad property the same twenty-percent discount. A second statute required all locally assessed taxable real property to be appraised "at current fair market value," but that value was to be rolled back to its January 1, 1978, level. Act of Mar. 11, 1981, ch. 233, § 2, 1981 Utah Laws 1171 (codified at former Utah Code Ann. § 59–5–109). Again, railroads and other state-assessed entities were not afforded the same treatment. This is the alleged de jure discrimination.[6] The alleged de facto discrimination is the result of alleged overvaluation of railroad property or undervaluation of other commercial

---

5. Counsel for the state represented at the hearings that, to the best of his knowledge, Union Pacific had not challenged the state's valuation for 1983.

6. The Utah Supreme Court upheld the constitutionality of § 59–5–4.5 but held § 59–5–109 unconstitutional. *Rio Algom Corp. v. San Juan*

*County,* 681 P.2d 184 (Utah 1984). In the wake of that decision, § 59–5–109 was repealed.

The *Rio Algom* decision was given prospective application only, so the effects of § 59–5–109 may be considered at least in determining whether the 1982 and 1983 assessments of the plaintiffs' property are discriminatory.

and industrial property.[7] All parties apparently agree that this court may determine whether all other commercial and industrial property in the state has been *under* valued for assessment purposes. The question these motions present is whether this court can also determine whether the state has *over* valued railroad property.

This court agrees generally with Union Pacific's reading of *Burlington Northern.* According to that decision, this court is precluded from probing into the assessment process to determine whether the state has accurately determined the "true market value" of a railroad's property absent a strong showing by the railroad that the state has purposefully overvalued its property with discriminatory intent. 715 F.2d at 498. *See also Atchison, Topeka & Santa Fe Ry. Co. v. Lennen,* 732 F.2d 1495, 1500 n.5 (10th Cir.1984).

Southern Pacific and the intervening counties argue that this court is required to determine the true market value of the railroads' property by the very language of section 306. Although the argument has a certain appeal to one who thinks that when Congress gives the courts a job to do it intends for them to do the whole job, the simple answer to the argument is that it was considered and rejected in *Burlington Northern.* The district court in that case concluded that, despite the arguably clear language of section 306, Congress meant to place states' valuation of railroad property outside the limits of district court scrutiny. 573 F.Supp. 1155, 1159 (D.Kan.1982). The Tenth Circuit affirmed. 715 F.2d 494 (10th Cir.1983), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984). According to the Tenth Circuit, Congress never meant for district courts to become super tax assessment authorities, *see* 715 F.2d at 498 (although they are fast becoming super personnel managers; but that's another story). Section 306 therefore cannot be construed to give district courts power to secondguess the state taxing authority ex-

cept in extraordinary circumstances (namely, where the state has purposefully discriminated against railroads).

Southern Pacific next tries to distinguish *Burlington Northern* on the grounds that it was a "valuation" case, whereas this case is an "equalization" case. Southern Pacific argues that, to the extent it alleges de jure discrimination independent of any overvaluation, its claim is one for "equalization," and since equalization can only be determined by an objective standard— namely, true market value—this court can determine the railroad's true market value as part of its equalization claim, to measure the amount of de jure discrimination. In other words, Southern Pacific would have this court let it in the back door after the front door has been barred to it.

Although courts have recognized a distinction between valuation claims and equalization claims, *see, e.g., Bair,* 766 F.2d at 1225; *Burlington N.,* 715 F.2d at 497, the distinction is tenuous at best and does not help the plaintiffs in these cases.

Evidence of a railroad's true market value is not essential for granting relief from de jure discrimination. The court can determine the plaintiffs' so-called equalization claim without determining true market value by accepting, for purposes of equalization relief, the state's valuation of railroad property. *See Burlington N.,* 573 F.Supp. at 1158–59.

Application of a label to the plaintiffs' claims does not change their character. The only reason for considering evidence of true market value is to challenge the state's valuation. And once a railroad seeks to have a court change the state's determination of value, it is seeking valuation relief, regardless of whatever other claims it may have. This court cannot do in the name of equalization what it is forbidden to do by *Burlington Northern,* namely, grant valuation relief. It was pre-

---

**7.** Southern Pacific also alleges that counties have been applying the statutory rate for residential property—15 percent for the years in question, *see* Utah Code Ann. § 59-5-1 (Supp.

1985)—to certain commercial and industrial property, thus giving locally assessed property an added discount not available to the railroads.

cisely this type of relief that the Tenth Circuit decided was unavailable under section 306, absent a showing of retaliatory or purposeful discrimination. *See* 715 F.2d at 497.

Finally, Southern Pacific argues that it comes within the exception recognized in *Burlington Northern* in that the state taxing authorities have purposefully discriminated against it in overvaluing its property. The court in *Burlington Northern* held that a suit to determine value could be maintained under section 306 "whenever a railroad can make a strong showing of a purposeful overvaluation of a particular railroad's property with discriminatory intent...." 715 F.2d at 498. The court emphasized "that a strong prima facie case of retaliation or intentional discrimination must be made" by the railroad before a district court could set aside a state's determination of value. *Id.*[8]

■ In most cases discriminatory intent cannot be proved by direct evidence but must be inferred. Certainly, evidence of what a defendant has done, though perhaps circumstantial, is probative of his intent. Evidence that a state has grossly overvalued a railroad's property might at least give rise to an inference of purposeful discrimination. A railroad should at least be entitled to introduce such evidence to meet its burden of establishing "a strong prima facie case" of intentional discrimination. The court therefore holds that, to the extent the plaintiffs allege that the state has intentionally discriminated against them, they may introduce evidence of their true market value, as well as other probative evidence, to establish their prima facie case of intentional discrimination. However, if they do not allege purposeful discrimination or if they fail to make out "a strong prima facie case," valuation will not be an issue in these cases. This court will

then have to accept as conclusive the state's final determination of the plaintiffs' true market value.

■ The court's holding that the plaintiffs may introduce evidence of their true market value to show purposeful discrimination is a narrow one. It does not open the gates wide to all evidence of value. First, it applies only to the plaintiffs and not to the intervening counties. The counties may challenge the plaintiffs' evidence, but they may not introduce evidence of what *they* believe the plaintiffs' true market value is unless valuation is first placed in issue by the plaintiffs' establishing a prima facie case of intentional discrimination. If county-assessed property is bearing a disproportionate burden of taxes because state-assessed property is undervalued, that is a matter for the state to deal with. Section 306 was not meant to prevent discrimination against counties, only against railroads.

■ Second, neither the plaintiffs nor the counties are free to challenge the state's *method* of valuation as long as that method is consistent with methods of valuing railroads generally. *Burlington Northern* is premised on the idea that Congress did not intend to dictate states' valuation methods (or the results), at least as long as the methods themselves were not chosen so as to discriminate against railroads. *See* 573 F.Supp. at 1163 ("The standards and methods of valuation that any State wishes to use would be totally unaffected by this legislation") (emphasis omitted) (quoting *Hearing Before the Subcommittee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce on H.R. 16245*, 91st Cong., 1st Sess. 138–39 (1970) (statement of Philip M. Lanier)). *See generally id.* at 1161–64.[9] Thus, absent a showing that the

---

**8.** In *Burlington Northern* the court held that substantial increases in the plaintiffs' property valuations from one year to the next, without more, were insufficient to establish discriminatory overvaluation, especially where the procedures the state used to value the railroads had

not changed and where they applied uniformly to all railroads in the state. 715 F.2d at 498.

**9.** The legislative history also suggests that Congress recognized that different types of property required different methods of valuation. *See* 573 F.Supp. at 1163 and authorities cited there-

state has discriminated against railroads by choosing a completely arbitrary method to value them, the evidence the plaintiffs may introduce on valuation is limited to evidence that the state has manipulated or misapplied its established procedures for valuing railroads.

## IV.

In short, absent a showing of intentional discrimination it is not this court's role to secondguess the state's determination of the railroads' value. Neither is it for this court to secondguess the Tenth Circuit. But by putting the state's valuation of railroad property off limits, the Court of Appeals has in effect required district courts to grant relief after doing only half a job. The Court of Appeals recognized this problem in *Burlington Northern.* The plaintiffs had argued that section 306

> requires comparison of assessments based upon the true market values of different classes of property and that a court cannot possibly determine whether relief is appropriate without being sure that apples are being compared to apples—that is, that the true market value of the railroad property is being compared to the true market value of other commercial and industrial property.

715 F.2d at 497. Although admitting that "the railroads' interpretation [of section 306] is a plausible one," the Tenth Circuit rejected it, concluding from the inconclusive legislative history that Congress intended to give the railroads only "equalization, not valuation, relief...." *Id.* Arguably, the distinction between equalization and valuation is thin at best since the thing

being "equalized" is assessment ratios, which, to be comparable at all, must be based on accurate valuations. Congress was arguably less concerned with the niceties of such distinctions than it was with stamping out *all* discrimination against railroads. *See Ogilvie v. State Board of Equalization,* 657 F.2d 204, 210 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981) (the purpose of section 306 "was to prevent tax discrimination against railroads in any form whatsoever"). Congress clearly thought that the states had discriminated against railroads and could not be trusted to police themselves—hence this federal legislation. And overvaluation is one obvious form of discrimination. The *Burlington Northern* decision may perpetuate discrimination against railroads by placing one leg of the caliper for measuring discrimination—valuation—firmly in the hands of the very party accused of discriminating (the state). If Congress did not trust states to give railroads equalization relief when the states already had the machinery in place for such relief, *see, e.g.,* Utah Code Ann. § 59-7-13 (Supp. 1985), it arguably did not trust them to properly value railroads either.

But even apart from the artificiality of any distinction between equalization and valuation relief, the conclusion is suspect on another ground. Section 306 presupposes that there is such a thing as *"the* true market value" of a given railroad, a single figure that presumably corresponds in some way to reality.[10] Yet, according to counsel, even using the same method of valuation (the unitary method) states have

---

in. Thus, the fact that a state may use one method for valuing railroads and another method or methods for valuing other types of commercial and industrial property does not necessarily mean that the method for valuing railroads is discriminatory.

**10.** *Cf. Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 192 (Utah 1984) ("The numerous formulae used to determine market value demonstrate that the term is a judgment not subject to mathematical precision that is based on a wide variety of factors.... '[M]arket value' is at best an approximation"). "Market value" is "an at-

tempt to create a fictitious sale of the subject property by assuming an owner willing to sell and a buyer desiring to buy." *In re McCannel,* 301 N.W.2d 910, 924 (Minn.1980). In the case of railroads there is often a paucity of willing sellers and buyers. And even where there is a ready market, factors such as the terms and conditions of sale "may affect the selling price and make it unrepresentative of the property's actual value." *Id.* at 922. So Congress's assumption that there is such a thing as "the true market value" capable of quantification may itself be suspect.

arrived at widely varying figures for the true market value of the same railroad. As long as its figures can escape review, a state can discriminate more effectively against a railroad by overvaluing it than it can by assessing it at a higher rate. If Congress meant for railroad property to be assessed at "the true market value," as it said, it must have envisioned some neutral means for arriving at that figure, and the only neutral means for valuing a railroad that this court can see is to have someone other than the interested states determine the value. The Interstate Commerce Commission would be the logical choice, but so far Congress has not seen fit to give it this task. But Congress clearly intended for federal courts to have some role in overseeing state taxation of railroads, as evidenced by section 306, so they might seem the next best choice as independent valuation boards. In any event, once the true market value of a railroad was determined in a neutral proceeding, each state could then use the same figure for assessing the same railroad, thus eliminating the most pernicious form of discriminatory tax treatment. But even assuming that this argument has some merit, it is not this court's role to petition the Tenth Circuit for reconsideration of its opinions. It must accept its role as defined by the Tenth Circuit and continue to do the somewhat incongruous job of comparing apples and oranges (or, in this case, apples and freight cars).

## V.

■ Given that this court must accept the state's determination of the railroads' true market value absent a strong prima facie case of purposeful discrimination, the question then becomes what to do with these cases pending a final state determination. The state of Utah and State Tax Commission have moved for a stay of these proceedings pending a final determination of value by the Utah courts. Under section 306, the defendants argue, this court is powerless to grant any relief unless the ratio of assessed value to true market value for railroad property exceeds by five percent the ratio of assessed value to true

market value for all other commercial and industrial property. And one cannot calculate the ratio for railroad property until one knows the true market value of railroad property.

Union Pacific, on the other hand, argues that, regardless of what figure the states finally come up with for the railroads' value, the *ratio* of assessed value to true market value must, by statute, equal twenty percent. A ratio is a fraction, and for purposes of these actions, the argument goes, it does not matter what the state decides the denominator of the fraction should be because it *must* adjust the numerator so as to make the total .20. The court can then compare that figure with its own determination of the ratio of assessed value to true market value for all other commercial and industrial property in the state and grant relief, even before a definitive determination of the railroads' true market value.

This court is inclined to follow the state's suggestion, at least to a point. As the Eighth Circuit noted, section 306 contemplates findings of fact on four different values: (1) the assessed value of the plaintiff's property, (2) the true market value of the plaintiff's property, (3) the assessed value of all other commercial and industrial property, and (4) the true market value of all other commercial and industrial property. *Bair*, 766 F.2d at 1226. In this circuit district courts are precluded from determining for themselves the second value but must plug into the formula whatever figure the state ultimately comes up with in order to arrive at a ratio for railroad property. But, under section 306, it is the *district court* that must calculate the two ratios and determine whether they vary by at least five percent. *Id.* We should not abdicate any more of our role to state agencies than necessary.

■ Moreover, as a preliminary matter this court must decide whether the plaintiffs have established a prima facie case of purposeful discrimination. To establish such a prima facie case, Southern Pacific intends to rely in part on an inference of discriminatory intent from the disparity be-

tween the state's determination of fair market value and that of the railroad. To even raise such an inference, however, Southern Pacific must show what the state's determination *is*, and it cannot do that until the state has arrived at a final determination of value.

Union Pacific's argument would be more persuasive if this court were convinced that the ultimate product of the state review process would be precisely a twenty-percent ratio, as required by statute. In *Rio Algom Corporation v. San Juan County*, 681 P.2d 184 (Utah 1984), however, the Utah Supreme Court suggested that the letter of the law could be slighted if necessary to give effect to the spirit of the law. In that case the plaintiffs had argued that section 59–5–4.5 of the Utah Code, which authorized county assessors to use eighty percent of the value of certain property as its reasonable fair cash value, violated article XIII of the Utah Constitution, which required all property to be "taxed in proportion to its value" and to be assessed "according to its value in money," which the Utah Supreme Court had previously construed to mean full cash value, that is, full market value. The court held that, where assessment of their property at full value would place a disproportionate burden on certain taxpayers, their property could constitutionally be assessed at less than full value:

> The law has long been that where "it is impossible to achieve both the standards of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law." *Delaware, Lackawanna & Western Railroad v. Neeld*, 23 N.J. 561, 570, 130 A.2d 6, 11 (1957), *quoting Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923).

681 P.2d at 194. "[I]f the assessors have not appraised at full value [as required by law] but only at a fixed percentage of true value, then such treatment must be uniform and equal on all real estate and tangible property, so much so that if both cannot be obtained then equality must prevail." *Id.* (quoting *Kittery Elec. Light Co. v. Assessors of Kittery*, 219 A.2d 728, 734 (Me.1966)).

Applying these principles to these cases, the State Tax Commission could conceivably assess the plaintiffs' property at less than twenty percent. The State Tax Commission is empowered to "increase, lower or sustain" an assessment "if necessary to equalize the assessment with other similarly assessed property." Utah Code Ann. § 59–7–12 (Supp.1985). In the pending administrative proceedings the commission could conclude that the railroads are being taxed at a disproportionately heavy rate but that revaluation of all other commercial and industrial property for the years in question would be impractical and unjust or that any revaluation should only apply prospectively. Then, under *Rio Algom*, the commission might be able to assess the railroad property at less than the statutory twenty-percent rate "to equalize the assessment with other similarly assessed property," rather than raising the assessments of all other property for the years in question.

■ Given the uncertainty of the result in the state proceedings and the clear prohibition in section 306 against granting any relief unless the assessment ratio of railroad property exceeds that of all other commercial and industrial property by at least five percent, this court prefers to await the outcome of the state proceedings. Until the court has a final, definitive figure for the railroads' true market value, it cannot complete its task under section 306.

The court sees no reason, however, why the parties should not proceed with such discovery as is consistent with this opinion, pending the outcome of any state proceedings. Therefore, the court will not stay all proceedings in these consolidated cases but only trial of these actions. These matters will be ripe for trial when the state proceedings furnish this court with a final determination of the value of the plaintiff railroads for the years in question.

At trial, the value of Southern Pacific's "transportation property" will be an issue only if Southern Pacific first makes a strong prima facie case of purposeful discrimination. However, it may introduce ev-

idence of its true market value as part of that prima facie case. Since the plaintiffs in the Union Pacific cases have not alleged retaliatory or purposeful discrimination, the true market value of their property will not be an issue. This court will accept the state's final determination of their true market value as conclusive evidence of that value.