The **BURLINGTON NORTHERN RAILROAD COMPANY,** Plaintiff,

v.

**Gerald D. BAIR, Director of the Department of Revenue of Iowa, Defendant.**

No. 4:90CV–60406.

United States District Court, S.D. Iowa, C.D.

June 11, 1993.

Order for Judgment Nov. 9, 1993.

Stephen D. Goodwin, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, TN, James McBride, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Washington, DC, Richard A. Malm, Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, IA, for plaintiff.

C.A. Daw, Dillion, Bosch & Daw Chartered, Boise, ID, James D. Miller, Asst. Atty. Gen., Des Moines, IA, for defendant.

### RULING AND ORDER

STUART, Senior District Judge.

Plaintiff's Motion for Instructions and defendant's Motion for Reconsideration came on for hearing May 25, 1993. After having heard the additional evidence and arguments of counsel and after having considered the pertinent filings, the court enters the following ruling and order.

#### Plaintiff's Motion for Instructions

In its motion, plaintiff pointed out that the court had erroneously computed the deduction for intangibles under the principle the court applied. The defendant did not respond to this claim and the court agrees with BN. The court accepted the values for the intangibles established by BN's experts and determined they equalled approximately 10% of the unit value of the railroad. The court erroneously took 10% of the value of the intangibles rather than 10% of the unit value to arrive at the deduction for the value of the intangibles. The deduction should be $385 million rather than $67.2 million. The plaintiff in drawing the order for judgment, shall make that correction.

#### Defendant's Amended Motion for Reconsideration

I. Intangibles

A.

■ The defendant's principal position in regard to the deduction of intangibles from the unit value of the railroad was the claim that Iowa taxed the intangibles of commercial and industrial enterprises in Iowa. The court did not agree for the reasons stated in the Ruling and Order filed March 9, 1993. 815 F.Supp. 1223

The defendant did claim that a deduction for intangibles would be very difficult to administer, but little evidence was offered on that issue. In order for the appellate court to have a complete picture of the administrative problems, the court received additional evidence "on the limited issue of the problems that the court's ruling on intangibles would present to the state." That evidence was presented at the May 25, 1993 hearing.

Although obtaining and analyzing the information required to value intangibles will be more complex and expensive, the state can arrive at values for the railroad's intangibles. However, that increased burden does not permit the state to tax BN's intangibles when commercial and industrial intangibles are not taxed as real estate. The 4R Act requires the state to treat railroads the same way other taxpayers in Iowa are treated.

The court finds that its decision that identifiable intangibles that can be valued must be deducted from the unit price of the railroad is susceptible to administration by the Director.

B.

The Director claims that BN has failed to prove the value of its intangibles by a preponderance of the evidence because it selected only certain intangibles for valuation and subtraction when some intangibles may have a negative value.

■ The court is satisfied that the methods used by BN to arrive at values for the intangibles are acceptable. The Director offered no evidence of different values. Under the present record the court believes that reasonable estimates of the value of the selected intangibles have been established by BN. It is too late to reargue these matters in a motion to reconsider. The director may take issue with the methods used and the values derived in the future.

As stated on page 36 of its ruling and order, the court was troubled by the fact that there was no proof of the contribution these intangibles made to the case flow used in the capitalization formula or the price of stock in the stock and debt method. I contemplated holding, for that reason, that BN failed to prove what amount should have been deducted from the unit price. Perhaps that would have been the proper ruling, but I believed that the method used to deduct personal property could be applied to intangibles, even though replacement cost and income evaluations are being used with book value.

The court denies the defendants motion for reconsideration of its ruling on the deductibility of the identified intangibles.

## II. Split between operating and non-operating property.

■ The court is satisfied that the evidence supports the acceptance of the Director's calculation of the rates between BN's operating and non-operating property. Mr. Goodwins' use of income rather than value to determine the proper percentage of non-operating property, in the court's opinion, is not correct. The ratio of income from operating property to the income from non-operating property would not necessarily represent the ratio of the value of operating and non-operating property. The comparison should be between the values of the operating and non-operating properties, not the income they produce. The court does not recall that an issue was ever made of the Director's calculation during the trial.

Plaintiff's motion to reconsider the split between operating and non-operating property is denied.

## III. Split between realty and personalty.

The director claims:

. The split between BNNR's taxable and non-taxable property should be calculated by reference only to book values of property owned by BNNR where only "property owned by BNRR is valued in the BNRR unit."

In the court's opinion the value of leases is picked up in the railroad's unit value in both the income and stock and debt appraisal methods and the break out of personal property must include leased property. The court believes this argument was adequately treated in the ruling and order.

Defendant's motion to reconsider on this ground is denied.

## IV. Yield capitalization rate

### A–1

The director argues that the court should have used the beta coefficient of 1.127 obtained from the tapes of the Center for Research on Security Prices (CRSP tapes). The court used a beta of 1.2, but did not explain why. The director asks why the "beta from the CRSP tapes is not useable in this instance."

The court has not reviewed the evidence to answer this question but its recollection is that the CRSP tape beta was the beta established before the BN reorganization that greatly increased the railroad's debt. The court felt that the increased leverage would cause the beta to rise. A beta of 1.2 is within the range estimated by BN's witness and is the industry average beta used by BN in Exhibit 1 at page 19.

### A–2

The director continues to argue that his cost of capital determination was supported by more than a preponderance of the evidence including internal calculations by BNRR, the Interstate Commerce Commission and the Director's experts. He does not point to any specific evidence.

The court believes this issue was adequately treated in the ruling and order and defendant's motion for reconsideration on this ground is denied.

### B and C

In these subdivisions defendant argues that the market risk premium and BNRR's equity rate are not affected by BN's high level of leverage after restructuring. The court disagrees and discussed this issue adequately in the ruling and order.

### D

■ In calculating BN's capitalization rate the court used the after tax debt rate. The parties agree that this was error. The court failed to recognize the distinction between capitalization rates calculated by the discounted cash flow method and the rate calculated by the income capitalization method.

If only the interest rate is changed in the calculations, the resulting capitalization rate of 14.83 per cent. In the court's opinion this rate is excessive. The cost of capital arrived at by plaintiffs experts in plaintiff's exhibit 1 at page 19 was 14%. The court believes 14% to be a reasonable capitalization rate.

In preparing the order for judgment the plaintiff shall use the capitalization rate of 14%.

The court is still not comfortable with the proportion of debt capital to equity capital used in computing the capitalization rate. The court considered BN's high leveraged position important in several areas. The court is unable to understand why the industry-wide percentage of debt capital and equity capital rather than BN's specific situation should be used for this computation. But as all experts used the same approach, the court relied on their expertize.

One other matter remains for resolution. The coal model used by BN's experts in arriving at its value for the coat contracts, included a unit value for the system of $2.5 billion. As the court determined a $3.8 billion value (which will be changed as a result of this ruling) the value of the coal contracts needs to be recomputed using the same formula used by BN to arrive at a value. Parties have indicated a willingness to try to agree on such calculation. If they are able to arrive at a revised figure, the corrected figure should be included in the order for judgment. If they cannot agree, they may submit the question to the court for resolution.

Except as stated herein defendant's motion for reconsideration is denied.

Plaintiff shall retain the responsibility for preparing an order for judgment in accordance with the original Ruling and Order as amended by this ruling.

IT IS SO ORDERED.

## ORDER FOR JUDGMENT

On March 9, 1993, the court filed a Ruling and Order in the above-entitled matter and directed Burlington Northern to prepare an Order for Judgment in accordance therewith. Defendant filed a Motion for Reconsideration. At the hearing on Director's motion, the parties agreed that the difference between Burlington Northern's unit value as determined by the court and the value used by Burlington Northern in its model would affect the value of the intangible asset, long term coal contracts. The court was under the impression that it was just a matter of inserting the court's unit value for Burlington Northern into mathematical computations. However, the parties have been unable to agree on the value of long term coal contracts and have furnished affidavits supporting their determinations of their value. Burlington Northern arrived at a value of $251,000,000. The Director valued them at a negative $136,000,000. The court considers both affidavits as attempts to bring in additional evidence after the record has been closed. Neither will be considered by the court in attempting to arrive at the value of long term coal contracts, the only issue remaining for resolution.

As the court has previously stated, intangible personal property has some value that should not be included in the value of Burlington Northern's real property in Iowa. Burlington Northern presented evidence relating to the value of intangible assets, computer software, work force in place and long term coal contracts. The court has accepted the value of computer software and work force in place as computed by Burlington Northern. The court has now re-examined the evidence in the record relating to the value of the long term coal contracts and has reached the conclusion that Burlington Northern has failed to carry its burden of establishing the value of the coal contracts by a preponderance of the evidence. Therefore, this element must be excluded from the calculations leading to the determination of the value of Burlington Northern's real estate taxable in Iowa.

The court was unable to accept Burlington Northern's dollar for dollar reduction of intangible assets from Burlington Northern's unit value. There is no relevant relationship between the computed values of the intangible assets and the contributions those assets made to the cash flow and unit value. As the court believed that these intangible assets had value that should not be included in an evaluation of Burlington Northern's real property, the court developed a formula which in its opinion was consistent with the formula used to arrive at the contribution tangible personal property made toward unit value.

Rightly or wrongly, the court will apply that formula in determining the value that computer software and work force in place contribute to Burlington Northern's unit value. That value is computed as follows:

| | |
|---|---|
| Book value of BN's railroad system | 5,798,250,000 |
| Values of the work force in place and computer software | 409,000,000 |
| Total | 6,207,250,000 |
| Intangible values as a percent of the system value (409,000 divided by 6,207,250) | 6.6% |

The computation of the true market value of Burlington Northern's real property in Iowa is as follows:

| | (000'S) |
|---|---|
| Unit Value [1] | 3,759,170 |
| Intangibles Deduction [2] | (248,105) |
| Tangible Unit Value | 3,511,065 |
| Allocation to Iowa (3.6497%) [3] | 128,143 |
| Tangible personalty deduction (39.6537%) [4] | (50,813) |
| Iowa real property value | 77,330 |
| Locally-assessed deduction [5] | (8,291) |
| True Market Value | 69,039 |

Based on the court's rulings and orders, the true market value of Burlington Northern's real property in Iowa for the 1989 tax year does not exceed $69,039,000, as calculated above. This calculation is based on the court's rulings that:

a. the income approach and the stock and debt approach should be given equal weight;

b. the income approach should utilize the latest year's NROI as reported in Burlington Northern's R–1 report (Schedule 210, line 67), adjusted only by adding non-operating taxes (ICC Supplemental Schedule 250) and by adding or subtracting deferred income taxes (Schedule 21, line 64);

c. a capitalization rate of 14% is appropriate;

d. the "add-back" of the value of leased equipment is improper;

e. the value of Burlington Northern Railroad Company's computer software and assembled work force must be deducted from the unit value.

The Director's assessment of Burlington Northern's real property for the 1989 tax year was $98,726,000. As shown above, the fair market value of Burlington Northern's real property in Iowa does not exceed $69,039,000. Therefore, the ratio of the assessed value to the true market value of Burlington Northern's property in Iowa is 143%. This ratio must be reduced to no more than 100% by reducing the assessed value to $69,039,000, or a reduction of $29,687,000.

Gerald D. Bair, the Director of the Department of Revenue and Finance of Iowa, his agents, and those acting in concert or participation with him, are enjoined and restrained from the levy, collection, or assessment of ad valorem taxes against Plaintiff Burlington Northern Railroad Company in the State of Iowa for the 1989 tax year as follows:

1. The Defendant is prohibited from assessing Burlington Northern's real property in Iowa at a ratio to its true market value exceeding the ratio of the assessed value of all other commercial and industrial real property in Iowa to the true market value of all such other commercial and industrial real property in Iowa. The highest permitted assessment is $69,039,000.

2. The Defendant is enjoined from adding the value of operating leased equipment to the unit value.

3. The Defendant is enjoined from using a capitalization rate in the income approach lower than 14%.

4. The Defendant is enjoined from taxing the value of the computer software and the value of the assembled work force.

The Clerk of Court is authorized and directed to enter judgment in accordance herewith.

IT IS SO ORDERED.

---

1. Ruling of March 9, p. 45, and Ruling of June 11, p. 6.

2. (3,759,170 × .066).

3. Plaintiff's Exhibit 61 (Director's workpapers).

4. Ruling of March 9, p. 30.

5. Plaintiff's Exhibit 61.